09-20470.rr

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

Case No. 09-20470 CR MARTINEZ

UNITED STATES OF AMERICA,

      Plaintiff,

vs.

DWIGHT CARTER, et al.,

      Defendants.

_____/

## REPORT AND RECOMMENDATION

**This matter** is before this Court on the Defendant Dwight Carter's Motion to Suppress Testimonial and Physical Evidence, filed May 7, 2010 (D.E. 145). The Court has reviewed the Motion, the Response, and all pertinent portions of the record. In addition, an evidentiary hearing was held on June 16, 2010 and the Court adopts the transcript of that hearing by reference.

## FACTS

Defendant is charged in the superseding indictment with one count of conspiring with Dwight Carter, Erskaneshia Ritchie, and Nikkia Thomas to commit a robbery of a Dunbar Security guard, in violation of 18 U.S.C. § 1951(a), one count of committing said robbery, and one count of carrying and using a firearm in relation to a crime of violence which caused the death of a person in violation of 18 U.S.C. §924(c)(1)(A), which killing was defined as a murder pursuant to 18 U.S.C. §1111.[1]

Defendant moves to suppress statements made to Miami Dade Police detectives subsequent to

---

[1] Defendant Carter is also charged with two narcotics offenses and with possession of a firearm in furtherance of a drug trafficking crime.

1

his arrest on May 20, 2009, as well as any physical evidence seized on the basis of those statements.

## DISCUSSION

Defendant makes three arguments in support of his motion to suppress: (1) there was no probable cause for his arrest; (2) the Government violated Fed.R.Crim.P. 5(a); and (3) Defendant did not freely and voluntarily waive his Miranda rights.

### I.  Probable Cause

Defendant was arrested pursuant to an arrest warrant signed by United States Magistrate Judge Ted Bandstra on May 19, 2009.  The complaint and affidavit in support of the warrant were signed by Miami Dade Police Detective Robert Christie.  Defendant argues that the arrest warrant was not supported by probable cause, which is defined as "facts and circumstances 'sufficient to warrant a prudent man in believing that the [suspect] had committed or was committing an offense.'" Gerstein v. Pugh, 420 U.S. 103, 111-12 (1975) (quoting Beck v. Ohio, 379 U.S. 89, 91 (1964)).

After examining the affidavit, the Court finds that it contains probable cause to believe that Defendant conspired to, and did commit the robbery in question.  To the extent that Defendant argues that the affidavit does not contain the full descriptions of the suspects as provided by each of the witnesses, and notes some discrepancies in the descriptions as provided by the witnesses, it is significant to note that the probable cause required for an arrest warrant is less stringent than the standard of proof of beyond a reasonable doubt, which is required for a conviction.  Probable cause is a "reasonable ground for belief of guilt," supported by more than mere suspicion, but less than prima facie proof. United States v. $242,484.00, 389 F.3d 1149 (11th Cir. 2004) (citation omitted).[2]

---

[2]The affidavit reflects that because it "is being provided for the limited purpose of establishing probable cause, it does not contain every fact known to law enforcement regarding this investigation." ¶2.

Defendant claims that Det. Christie's statement that "[Defendant] was using the Metro PCS cell phone on December 1, 2008" is recklessly false, entitling him to a "Franks hearing" pursuant to Franks v. Delaware, 438 U.S. 154, 171 (1978). Under Franks, a defendant may challenge the veracity of an affidavit in support of a warrant if he makes a "'substantial preliminary showing' that (1) the affiant deliberately or recklessly included false statements, or failed to include material information, in the affidavit; and (2) the challenged statement or omission was essential to the finding of probable cause." United States v. Arbolaez, 450 F.3d 1283, 1293 (11th Cir. 2006) (citing Franks, 438 U.S. at 155-56).

The Court finds that Defendant has failed to make the necessary preliminary showing for a Franks hearing as to this statement. First, Defendant has not offered any evidence that the statement was false (i.e., that Defendant was not using the phone on the date in question). Moreover, there is no showing that Det. Christie was reckless in his belief that Defendant was using the phone, because: (1) the phone was registered in Defendant's mother's name (¶13)[3] and (2) the affidavit states that "call patterns" on the telephone revealed, "based on the persons the phone is calling," that Defendant was using the cell phone on that day. See ¶¶ 14 -15.

Moreover, even if Det. Christie's statements regarding the cell phone usage could be considered to be false, if they are removed from the affidavit, the identification of Defendant's photograph in a photo lineup by two eyewitnesses adequately provides the probable cause necessary to support the arrest. See, e.g., United States v. Burbridge, 252 F.3d 775, 778 (5th Cir. 2001) ("An ordinary citizen's eyewitness account of criminal activity and identification of a perpetrator is

---

[3]The Court rejects Defendant's argument that it was necessary for Det. Christie to provide the details as to "how [he] ... determined that Patricia Carter was in fact, related to [Defendant]." Mot. p. 7.

3

normally sufficient to supply probable cause to stop the suspect."); Woods v. City of Chicago, 234 F.3d 979, 996 (7th Cir. 2001) ("[W]e have consistently held that an identification or a report from a single, credible victim or eyewitness can provide the basis for probable cause.").  Contrary to Defendant's assertion, the affidavit does contain information as to the reliability of the witnesses in that it discusses the vantage point from which the witness was able to observe the Defendant.

Accordingly, the Court therefore finds that Defendant is not entitled to a Franks hearing and the affidavit is supported by probable cause.

## II.  Post Arrest Statement/Evidence

Defendant next argues that his post-arrest statements and any evidence seized as a result of those statements must be suppressed because (1) there was an impermissible delay in presenting him to a Magistrate Judge; and (2) he did not freely and voluntarily waive his Miranda rights.

### A.  Testimony

Testimony regarding Defendant's arrest on May 20, 2009 and subsequent proceedings was provided by Defendant's mother, Patricia Carter, Detective Christie, and Miami Dade Police Detective James Hatzis.

### Patricia Carter

Mrs. Carter, who lives with Defendant, testified that on the day in question, she got up at 5:00 a.m. and got ready for work, as usual.  At some time prior to 6:00 a.m., she heard someone outside the house say "Dwight, Dwight, come out now."[4]  She looked out the window and saw "lots of cops" and police lights.  She knocked on Defendant's bedroom door and told him to come out.  When he

---

[4]Mrs. Carter testified that she is certain that this occurred prior to 6:00 a.m., because that is the time that she always leaves for the bus stop to go to her job as a school cafeteria worker.

4

did, she opened the front door and saw a lot of police, some with weapons pointed at her, yelling at Defendant to come out.

Mrs. Carter confirmed that Defendant had a cell phone on the day in question. She also stated that later that day, she brought Defendant's son to the police station to see Defendant.

On cross-examination, Mrs. Carter could not recall what time the bus she takes to work arrives and leaves. She also could not recall whether Defendant responded when his name was called over the loud speaker, or whether Defendant was dressed or not when she tried to get him to come out of his room.

### Detective Robert Christie

Det. Christie, who was working as part of an ATF task force on May 20, 2009, testified that Defendant was arrested on a federal warrant after 6:00 a.m.. He stated that he was aware of the time because when he and his partner arrived at Mrs. Carter's house, he attempted to call Defendant three times on a cell phone which was registered to Erskaneshia Ritchie ("Ritchie"), but which he thought Defendant would be using.[5] No one answered on the first two attempts, which were at approximately 6:15 a.m. At approximately 6:17 a.m., Erskaneshia Ritchie answered the call but Defendant did not come out.[6]

Det. Christie further testified that when Defendant did not exit the house as requested, he used the public address system to call him out. He saw the front door open and Defendant clear the door, at which point he was patted down by the Special Response Team. Once he was made safe,

---

[5]Det. Christie testified that officers believed that Ritchie was also at the house that day.

[6]Det. Christie identified photographs of the cell phone at issue, which reflected on the screen that an eighteen (18) second incoming call was received on that phone at 6:17 a.m. from the phone which had been assigned to Det. Christie.

he was walked to the parking area, where Det. Christie patted him down and placed him in a police car. Det. Christie testified that the time of Defendant's arrest was 6:20 a.m.. Det. Christie stated that Defendant was very cooperative, and that no problems occurred during Defendant's time on the scene, which was between forty-five minutes and one hour, during which time officers spoke to Mrs. Carter and Erskaneshia Ritchie.[7]  Det. Christie did not advise Defendant at that time why he was in custody.

Det. Christie further testified that Defendant was taken to Miami Police Department homicide headquarters for paperwork, major case prints and DNA swabs. The next afternoon, May 21, 2009, he was taken by the Bureau of Prisons officers to the U.S. Marshal at the Federal Detention Center for his initial appearance on the 1:30 p.m. calendar before a federal Magistrate Judge.

Det. Christie testified that in order for Defendant to have been placed on the 1:30 p.m. duty calendar on May 20, 2009 for an initial appearance, Defendant would have had to have been transferred to the U.S. Marshal by 11:30 a.m.. He agreed that Defendant could have been taken to the Marshal at the time of his arrest, and that the drive from the house to the federal courthouse would have been approximately 20 minutes at that hour of the day.[8]

**Detective James Hatzis**

Miami Dade Police Detective James Hatzis testified that on May 20, 2009, agents met at 4:00 a.m. to go over a plan which was in place to apprehend Defendant Carter and Defendant Maxime on a federal arrest warrant and make contact with the other individuals who were involved with the

---

[7]Defendant was initially in a car by himself, then was transferred to a car with Ritchie.

[8]Defendant called private investigator Reginald James Hope, who testified that the distance from the house to the federal courthouse was under six miles and that it would take approximately thirteen minutes to drive at that time.

robbery.  An interview with Defendant was also to take place.

Det. Hatzis was located around the corner from the Carters' house when he was advised of the Defendant's arrest at approximately 6:18 a.m..  He left the scene at 7:20 a.m. and ordered that Defendant be transported back to homicide headquarters.[9]  He also advised the officers on the scene to attempt to get consent to search the house and a vehicle.  Det. Hatzis testified that no one mistreated or threatened Defendant at the scene, nor did Defendant complain of any such treatment.

Det. Hatzis arrived at headquarters at 7:47 a.m. and had his first contact with Defendant at 8:25 a.m. when he and Detective Stroze went into the interview room where Defendant was sitting in a chair in handcuffs, and uncuffed him.  They advised Defendant that they were going to speak with him but he needed to be advised of his rights first.  At various times during the interview, Defendant asked for food and/or drinks and the opportunity to use the restroom.

The detectives first asked for biographical information and Defendant responded that he had finished the 10th grade, that he had no trouble reading or writing English, that he had not taken any narcotics or other medication, and had no mental or physical illnesses.  Defendant also wrote notations to this effect in the upper corner of a <u>Miranda</u> warning form, and included a notation that he worked as a salesman.  Defendant said that he had gone to bed the night before at 10:00 p.m. and had slept until he was awoken at 6:00 a.m.

Det. Hatzis testified that Defendant read the <u>Miranda</u> rights aloud from the <u>Miranda</u> warning form and placed his initials on the form, indicating that he understood and was willing to waive his rights.  Defendant appeared to be lucid and had no questions regarding the form.  Defendant signed the form at 8:31 a.m. and said that he was willing to speak.

---

[9]Defendant was allowed to get clothes before he was transported.

7

Det. Hatzis began the interview by asking Defendant questions about his family, associations and social life. He then told Defendant that an arrest warrant had been issued in his name for murder but did not tell him at that time where the murder had occurred. Det. Hatzis testified that during the interview, Defendant was cooperative, straightforward and gave details. He was offered a break at 9:00 a.m. but said he could continue, then asked for a break at 9:12 a.m., which he was given, and was told to knock on the door if he needed anything.

The interview resumed at 10:04 a.m. at which time they continued the discussion about Defendant's background and got further details about Defendant's associates and other past criminal activity that he had been involved in. During the 10:00 hour, Det. Hatzis showed Defendant photographs of Defendant Maxime and others involved in the robbery and asked Defendant whether and how he knew them. At 11:00 a.m. some food for Defendant was ordered. Det. Hatzis left the room and Det. Stroze continued getting background information. At 11:24 a.m.., Det. Hatzis returned to the room and showed Defendant a photograph of the vehicle that was used in the robbery. As of this point, although Defendant indicated that he knew the other participants, and that the vehicle was his, Defendant had not yet implicated himself in the robbery.

At 11:40 a.m., Det. Hatzis showed Defendant some charts which showed cell phone usage around the Dadeland mall between a phone registered in the name of Defendant's mother, and Defendant Maxime, Erskaneshia Ritchie, and Nikkia Thomas. Det. Hatzis went through the ninety-one (91) pages of charts, which took about ten minutes. When he showed Defendant the date that the charts referenced, Defendant became "emotional" and made some spontaneous statements regarding killing the Dunbar guard. At 12:05 p.m., the food arrived but Defendant stated that he did not want to eat it then. Det. Hatzis testified that by 12:15 p.m. Defendant had provided the "entirety"

8